No. 41,850

THE STATE OF KANSAS, ex rel. MAXINE WOOD, County Attorney of Seward County, Kansas, *Appellant*, v. THE CITY OF LIBERAL, and THE BOARD OF EDUCATION OF THE CITY OF LIBERAL, *Appellees*.

(352 P. 2d 7)

Opinion filed May 14, 1960.

*Maxine Wood*, county attorney, argued the cause, and *John Anderson, Jr.*, attorney general, was with her on the briefs for the appellant.

*John William Wood*, of Liberal, argued the cause, and *Grover L. Bryan*, of Liberal, was with him on the briefs for the appellee board of education.

*Victor H. Tegarden*, city attorney, was on the briefs for the appellee city of Liberal.

The opinion of the court was delivered by

Robb, J.: This is a quo warranto action commenced by the state, on the relation of the county attorney of Seward county, challenging the authority and power of the city to deed certain land to the board of education for a school building site and operation thereof. The trial court entered judgment for the defendant city and school board to execute and carry out their contract and the state perfected this appeal from that judgment.

The United States of America and the particular agency or successor thereto will be referred to as the government.

The evidence consists of documents and stipulated facts which summarized are: In 1948 the government by quitclaim deed conveyed to the city 160 acres of land, located at its west limits, subject to existing easements for roads, highways, public utilities, pipelines, and a sewer system of the 160 acre Liberal Army Airfield used in serving an adjacent civilian war housing project. The conveyance was also subject to existing mineral leases with a condition that the city, its successors and assigns thereto in order to eliminate hazards to the operation of the airport obtain from the lessees one of the following: Cancellation of leases; indefinite suspension of leases; or limitation on mineral exploration. Excepted were certain personal property not pertinent hereto and all uranium, thorium, and other materials in the land peculiarly essential to production of fissionable material under the Atomic Energy Act. The 160 acre tract was duly declared surplus and the city, its successors and assigns, were to have and to hold it forever subject to the restrictions, reservations, exceptions and conditions set forth therein to be used for public airport purposes for the use and benefit of the public on reasonable terms, without unjust discrimination and without grant of any exclusive right.

Other sections of this quitclaim deed are not material except subparagraph (6) that in substance provides none of the property shall be used, leased, sold, salvaged, or disposed of by the city for other than airport purposes without the government's written consent which shall be granted only if the government determines that it can be used, leased, sold, salvaged or disposed of for other than

airport purposes without materially and adversely affecting development, improvement, operation, or maintenance of the airport.

Next in point of time, and on June 10, 1959, after a request by the school board to have the city convey to the board for a school site 39.97 acres located near the center along the east border of the 160 acre airport, the government executed a "Deed of Release," the pertinent portions of which provided that the city, its successors and assigns reserved all mineral rights; that the 39.97 acres were no longer required to serve the purpose for which they were transferred to the city; the government was agreeable to the sale thereof to the board of education and to release of the previous reservations, restrictions and conditions, and release thereof was thereby made; the city, its successors and assigns for the benefit of the general public, reserved an easement and right of way for the free, unobstructed passage of all aircraft in and through the airspace above a height of 150 feet and also reserved the right to remove any and all future structures or growth extending above that limit. In addition the city was not to permit or suffer any use or construction on the 39.97 acres which would create electrical interference with radio communication between airport and aircraft, or make it difficult to distinguish between airport lights and others, or would result in glare in the eyes of flyers, impair visibility, or otherwise endanger the landing, taking off, or maneuvering of aircraft. Finally, the release provided the above reservations were to be valid only so long as the Liberal Municipal Airport was used for airport purposes.

The provisions of the above "Deed of Release" were incorporated into a deed executed by the city to the school board which also contained an additional reservation that in the event the property ceased to be used and maintained for school purposes, title would revert to the city. The form of this deed was approved by the government and was attached as an exhibit to the contract entered into between the city and the school board. Complete analysis of that contract is not necessary but mention will be made of those parts that are basic to the state's contentions of error in the trial court's judgment.

The board of education agreed to relocate, at its own expense, the present municipal golf course, the softball diamond, and utility lines on the transferred property as deemed necessary by the city, in accordance with the city's specifications. If the golf course was

used in school athletic programs, the school board would pay up-keep and maintenance in proportion to that use. The school board was also to pay a nominal consideration of $10.00 and the city was to furnish and designate the areas of city-owned property to which the school board could move the softball diamond and golf course. If legal proceedings determined that the city did not have legal authority to "donate" the 39.97 acres, then the school board agreed to pay $1,000 per acre for the transfer. The city had the option of transferring in parcels as the school board completed its obligations since it could not all be done in a short time.

On December 2, 1958, the city adopted a resolution wherein it was repeated how it had originally acquired the 160 acres and the request by the school board for a conveyance of the 39.97 acres which tract was not revenue producing nor usable for airport operations or city purposes except the municipal golf course and softball diamond; that the board of education, in conjunction with the Seward County Fair Board, had agreed to pay for moving the golf course and softball diamond to the area south of the above tract; that it was advisable and in the interest of the city and its inhabitants to grant the school board's request subject to authorization and approval by the government; upon such authorization and approval the mayor and city clerk were authorized and directed to execute, acknowledge and deliver the deed on behalf of the city.

At the outset, the state claims that neither the city nor the school board has the power or authority to do what they are undertaking in attempting to convey the 39.97 acres. The city meets that contention with the familiar proposition that nothing on the subject was presented to or ruled upon by the trial court. The record does not disclose how the question came to the attention of the trial court, but in view of the language quoted below from the formal journal entry of judgment, signed by the trial court, we conclude the city's proposition is not well taken:

"This Court therefore finds that the City and the Board of Education are authorized by law to carry out their contract and the injunction sought by the state is denied."

G. S. 1949, 12-101, reads:

"Each city shall be a body corporate and politic, and shall have power—

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"*Second.* To purchase or receive, by bequest or gift, and hold, real and personal property for the use of the city.

"*Third.* To sell and convey any real or personal estate owned by the city, and make such order respecting the same as may be deemed conducive to the interests of the city, and to provide for the improvement, regulation and government of the same.

"*Fourth.* To make all contracts and do all other acts in relation to the property and concerns of the city necessary to the exercise of its corporate or administrative powers.

. . . . . . . . . . . . . .

"*Sixth.* To exercise such other and further powers as may be conferred by law."

The city calls attention to G. S. 1959 Supp. 12-1739 which gives no more power and authority than is granted in G. S. 1949, 12-101, *Third,* but the newer statute at least denotes that the power and authority granted cities under the older statute has not been decreased. Under G. S. 1959 Supp. 12-1736, cities have also been granted authority to erect or construct, acquire by gift, purchase, condemnation or lease a public building or buildings and may likewise procure any necessary site therefor jointly or in cooperation with any other governmental unit so empowered, upon such terms and conditions as shall be agreed upon by the governing body of the city and the governing body of such cooperating governmental unit.

In connection with the above statute, both the board of education and the city have the same power and authority to acquire real property. When G. S. 1959 Supp. 72-1625 is examined, it becomes apparent that the legislature in 1951 quite properly extended the authority and power of school boards in cities of the second class to that already had by school boards in cities of the first class under G. S. 1949, 72-1735, now repealed. The state's contention that an election was necessary could have had merit, at least so far as the board of education is concerned under the requirements of G. S. 1949, 72-1820, now repealed, but under the 1951 law the state's contention has lost its force.

In *State, ex rel., v. City of Garnett,* 180 Kan. 405, 304 P. 2d 555, this court refused to enjoin the act of a board of county commissioners in a joint improvement to construct and maintain a wider street, parking area and replace sidewalks on county property, the expense of which was to be paid by the city in consideration for the easement for the improvement granted to it by the board.

From a logical standpoint the moving of the golf course, utilities, and softball diamond was the consideration here. Otherwise, the

school board would have to pay $1,000 per acre and the city would have to do the relocating.

Admission is made by both the city and state that the school board has the power and authority to choose, purchase and pay for a school site. (*State, ex rel., v. Board of Education of the City of Beloit,* 177 Kan. 540, 280 P. 2d 929.) The state contends the school board has no authority to expend school funds as the board in the instant case proposes to do. The school board in relocating the softball diamond and golf course can and probably will make use of these recreational facilities and under the ruling in the city of Garnett case, no distinction appears between what the city was doing on the county property in the joint improvement there involved and relocating the golf course, softball diamond, and municipally owned utilities in this case. The state has not distinguished the two cases and we think the trial court correctly denied the injunctive relief sought by the state in its quo warranto action.

Judgment affirmed.